AUSA:   Michael El-Zein           Telephone:  (313) 550-2922
Special Agent:      Collin Ward           Telephone:  (314) 574-8928
AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | Case: 2:20−mc−51137 |
| *(Briefly describe the property to be seized)* | ) | Assigned To : Parker, Linda V. |
| All Funds on Deposit in JP Morgan Chase Bank Account | ) | Assign. Date : 9/25/2020 |
| Number 3026585640 as further described on Attachment A | ) | In Re: SEALED MATTER (MAW) |
| | ) | |

Case No. appears between the rows.

### APPLICATION FOR A WARRANT
### TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____Eastern_____ District of _____Michigan_____ is subject to forfeiture to the United States of America under _____ U.S.C. § _____ *(describe the property)*:

18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(7) -- All Funds on Deposit in JP Morgan Chase Bank Account Number 3026585640 as further described on Attachment A

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

_____
*Applicant's signature*

FBI SA Collin Ward
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____September 25, 2020_____

_____
*Judge's signature*

City and state: _____Detroit, MI_____

Elizabeth A. Stafford        U. S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT</u>

I, Collin Ward, Special Agent for the Federal Bureau of Investigation, being duly sworn, depose and state as follows in support of the government's application for the issuance of seizure warrants for all funds on deposit up to $69,110.00 in the following bank account, referred to as the **Target Account**:

> **JP Morgan Chase Bank Account No. 3026585640, held in the name of Emilio J. Berrios-Antuna.**

The funds to be seized from the **Target Account** constitutes a portion of the proceeds of a health care fraud scheme that resulted in over $5,000.000.00 in Medicare funds being fraudulently obtained for services and Durable Medical Equipment (DME) products that were medically unnecessary and/or not eligible for Medicare reimbursement.

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I am a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such, and have been employed as such since May 2008. As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering, and telephone analysis from the FBI, and I have been personally involved in investigations concerning health care fraud and methods used to finance and conceal the profits of those operations. I have interviewed numerous medical doctors, owners and employees of medical clinics, and patients. I have investigated and conducted surveillance on doctors, pharmacies, and owners of medical facilities. I have consulted with agents and officers of federal, state, and local agencies in gaining an understanding of trends in health care fraud. I am currently assigned to the Detroit Division of the FBI and my duties include investigating health care fraud.

2.      Based on my training, experience, and participation in financial investigations

involving the concealment of funds and assets in order to prevent detection by law enforcement

agencies, I have observed that:

  a. Individuals involved in illegal activities often generate large amounts of cash and money through those activities. These individuals often use the cash and money to facilitate the operation of their illegal activities by disguising fund transfers to close associates as legitimate income payments, and purchasing legitimate personal items, such as housing, cars, jewelry, and clothing.

  b. Individuals attempting to conceal their income or illegal activities frequently transfer assets to friends, relatives, or close associates to avoid detection of those assets by the IRS and other government agencies. Even though such assets are in the names of others, the true owners of the assets typically continue to exercise dominion and control over these assets.

  c. Individuals involved in illegal activities often use banks to conduct financial transactions involving proceeds of their criminal activities. Such individuals often establish multiple businesses and transfer funds between accounts to disguise the nature, source, ownership, control, and location of criminal proceeds, and to make their wealth appear to have been obtained legitimately. Such individuals also often commingle their criminal proceeds with legitimate funds in bank accounts or other financial accounts in order to conceal the illegal source of their criminal proceeds.

I refer to these methods that criminals often use to conceal the nature, source, ownership, control, and location of their criminal proceeds as "money laundering."

3.    As a Special Agent with the FBI, I am responsible for investigating violations of United States federal law, including, but not limited to Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1347 (Health Care Fraud), and Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud). I have participated in the execution of search warrants for documents and other evidence as well as seizure warrants in cases involving violations of these offenses.

4.    I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation and information provided to me by other law enforcement agents and investigative personnel. This affidavit is intended to show merely that there is

sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this investigation.

## PURPOSE OF THE AFFIDAVIT

5.      This affidavit is submitted in support of an Application seeking authorization to seize and/or freeze all funds on deposit up to $69,110.00 contained in the **Target Account**.

6.      As discussed herein, the statements in this affidavit are based upon information I learned during the investigation, including information provided to me by other law enforcement agents, government employees, and government contractors and upon my experience and background as an FBI Special Agent. Since this affidavit is being submitted for the limited purpose of supporting a seizure warrant, I have not included every fact known to me concerning this investigation. This affidavit is intended to show merely that sufficient probable cause exists for the requested seizure warrants and does not set forth all of my knowledge about this investigation.

7.      Based upon my training and experience, and the information set forth in this affidavit, there is probable cause to believe that the funds in the target account constitute: (a) the proceeds of illegal activity, and/or property traceable to proceeds of illegal activity, specifically health care fraud in violation of 18 U.S.C. 1347; (b) the gross proceeds of illegal activity, and/or property traceable to gross proceeds of illegal activity, specifically health care fraud in violation of 18 U.S.C. 1347. As such, these funds are subject to seizure and civil and/or criminal forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(7).

## VIOLATION STATUTES

8.      Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

3

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of

the money or property owned by, or under the custody or control of, any health care

benefit program, in connection with the delivery of or payment for health care benefits,

items, or services, shall be fined under this title or imprisoned not more than 10 years, or

both.

9.      Title 18, United States Code, Section 24(b), defines a "health care benefit

program" as, among other things, "any public or private plan . . . affecting commerce, under

which any medical benefit, item, or service is provided to any individual, and includes any

individual or entity who is providing a medical benefit, item, or service, for which payment may

be made under the plan."

## APPLICABLE FORFEITURE STATUTES

10.      18 U.S.C. § 981 *Civil Forfeiture*

(a)(1) The following property is subject to forfeiture to the United States:

> (C) Any property, real or personal, which constitutes or is derived
> from proceeds traceable to a violation of section 215, 471, 472,
> 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501,
> 502, 510, 542, 545, 656, 657, 842, 844, 1005, 1006, 1007, 1014,
> 1028, 1029, 1030, 1032, or 1344 of this title or any offense
> constituting "specified unlawful activity" (as defined in section
> 1956(c)(7) of this title), or a conspiracy to commit such offense.

(b)(1) Except as provided in section 985, any property subject to forfeiture to the
United States under subsection (a) may be seized by the Attorney General
and, in the case of property involved in a violation investigated by the
Secretary of the Treasury or the United States Postal Service, the property
may also be seized by the Secretary of the Treasury or the Postal Service,
respectively.

(b)(2) Seizures pursuant to this section shall be made pursuant to a warrant obtained
in the same manner as provided for a search warrant under the Federal Rules
of Criminal Procedure . . . .

4

(b)(3) Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found.

11.     18 U.S.C. § 982 *Criminal Forfeiture*

(a)(7) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

12.     18 U.S.C. § 984   *Civil Forfeiture of Fungible Property*

(a)(1) In any forfeiture action in rem in which the subject property is . . . funds deposited in an account in a financial institution . . .

(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture; and
(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

## THE MEDICARE PROGRAM
### Generally

13.     Medicare is a federally funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency within the United States Department of Health and Human Services (HHS). Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

14.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

15.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helps pay the cost of physician services, medical equipment and supplies, and other health services and

supplies not paid for by Part A.

16.　　Specifically, Medicare Part B covers medically necessary physician office services, including the ordering of durable medical equipment (DME) such as arm, leg, back, and neck braces.

17.　　By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care providers are given and provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

18.　　 Health care providers can only submit claims to Medicare for reasonable and medically necessary services that they rendered.

19.　　Medicare regulations require health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records are required to be sufficient to permit Medicare, NCI AdvanceMed and other contractors, to review the appropriateness of Medicare payments made to the health care provider.

**Telemedicine**

20.     Telemedicine provides a means of connecting patients to doctors by using telecommunications technology, such as the internet or the telephone, to interact with a patient.

21.     Telemedicine companies provide telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically pay doctors a fee to conduct consultations with patients.

22.     Medicare Part B covers expenses for specified telehealth services if certain requirements are met. These requirements include that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

23.     However, the Medicare regulations regarding telehealth concern only payment for telehealth consultation services and do not prohibit the order/referring of DME where the consultation itself is not billed to Medicare.

**Orthotics**

24.     Orthotic devices, or orthoses, are DME items that are applied to the outside of the body to support a body part. They are commonly referred to as "braces." Examples of orthotic devices include back braces, knee braces, ankle braces, wrist/hand supports, and arm/shoulder supports.

25.     According to the CMS website, CMS.gov, Section 1847(a)(2) of the Social Security Act defines Off-The-Shelf (OTS) orthotics as those orthotics, covered by the Act, which require minimal self-adjustment for appropriate use and do not require expertise in trimming,

7

bending, molding, assembling, or customizing to fit to the individual. Orthotics that are currently paid under the Act and are described in the Act are leg, arm, back, and neck braces. The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130 provides the longstanding Medicare definition of "braces." Braces are defined in this section as "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

26.    To receive reimbursement from Medicare for items such as OTS orthotics, a DME supplier is required to submit a claim, either electronically or in writing, through standard forms, either the Form CMS-1500 or UB-92. Both of these claim forms require important information, including: (a) beneficiary's name and identification number; (b) the name and identification number of the referring/ordering provider who ordered/prescribed the OTS orthotics; (c) the health care benefit item that was provided or supplied to the beneficiary; (d) the billing codes for the specified item; and (e) the date upon which the item was provided or supplied to the beneficiary.

27.    Before submitting a claim to Medicare, a DME supplier must have the following on file: a dispensing order, written order, some type of certificate of medical necessity, and information from the treating physician concerning the patient's condition and diagnosis. The documentation must be maintained in the supplier's files and pursuant to the Health Insurance Portability and Accountability Act (HIPAA), Medicare providers are required to retain required documentation for six years from the date of its creation. A supplier must have a hard copy, faxed, or electronic order in their records before the supplier can submit a claim for payment to Medicare.

28.    A Local Coverage Determination (LCD) is a decision made by a Medicare

Contractor on whether a particular service or item is reasonable and necessary, and therefore covered by Medicare within the specific region the contractor oversees. See Section 1869(f)(2)(B) of the Social Security Act.

29.      According to LCD L33318, in place nationally for services performed on or after October 1, 2015, knee braces, including code L1851, require an examination of the patient. The LCD states that knee braces are medically necessary only where knee instability is documented by an in-person examination of the beneficiary and objective description of joint laxity (*e.g.*, varus/valgus instability, anterior/posterior Drawer test). Claims are not reasonable and necessary if only pain or a subjective description of joint instability is documented.

30.      According to LCD L33790**,** back braces, including code L0651, are covered only when they are ordered: (1) to reduce pain by restricting mobility of the trunk; (2) to facilitate healing following an injury to the spine or related soft tissues; (3) to facilitate healing following a surgical procedure on the spine or related soft tissue; or (4) to otherwise support weak spinal muscles and/or a deformed spine.

## RELEVANT ENTITIES

### *Dr. Emilio Berrios-Antuna*

31.      Dr. Emilio Berrios-Antuna (BERRIOS-ANTUNA) is a licensed physician residing in Sterling Heights, Michigan, specializing in family practice.

32.      Medicare records indicate that BERRIOS-ANTUNA has been an enrolled provider with Medicare dating back to at least April 1, 2008, and as such, has certified to Medicare that he would comply with all Medicare rules and regulations, including that he would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

*RediDoc*

33.     RediDoc is a telemedicine company located in Scottsdale, Arizona. According to corporate records filed with the Arizona Corporation Commission, Stephen Luke is listed as the manager and registered agent of RediDoc.

*Quivvy Tech Corp.*

34.     Quivvy Tech Corp. (Quivvy) is a telemedicine company located in Boca Raton, Florida.

## INVESTIGATIVE BACKGROUND

35.     In late 2019, the FBI and HHS-Office of Inspector General (HHS-OIG) initiated an investigation into BERRIOS-ANTUNA in connection with an ongoing nationwide investigation into the telemedicine industry. This investigation regarding BERRIOS-ANTUNA focused on the submission of false and fraudulent claims to Medicare for DME products that were medically unnecessary and/or not eligible for Medicare reimbursement.

36.     As explained in more detail below, BERRIOS-ANTUNA never spoke to, or examined, the beneficiaries and only reviewed limited, vague, and usually incorrect information that was provided to him from RediDoc. BERRIOS- ANTUNA would then refer multiple DME products for each Medicare beneficiary that were often medically unnecessary and/or not eligible for Medicare reimbursement.

## PROBABLE CAUSE FOR UNDERLYING VIOLATIONS

37.     Probable cause is established by statements from BERRIOS- ANTUNA, Medicare beneficiaries and other witnesses, Medicare data, emails, phone records, written orders for DME products, and financial records. This evidence demonstrates that the DME certified by BERRIOS-ANTUNA was medically unnecessary and/or not eligible for Medicare

reimbursement but nonetheless billed to Medicare. Finally, the evidence also shows BERRIOS-ANTUNA used the Target Account to carry out these crimes.

## A.     MEDICARE DATA

38.     Medicare claims data demonstrates that from January 1, 2017, until October 10, 2019, BERRIOS-ANTUNA was listed as the referring physician on approximately 8,000 claims for DME products for approximately 3,000 Medicare beneficiaries. These referrals for DME by BERRIOS-ANTUNA led to approximately $9.4 million in billings to Medicare, and Medicare paying DME suppliers approximately $5 million.

39.     From January 1, 2017, until October 10, 2019 the top five DME products referred by BERRIOS-ANTUNA to Medicare beneficiaries were as follows:

Code L1851 (Knee orthosis):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
|---|---|---|---|
| 1,825 | 2.984 | $3,517,391.69 | $1,936,407.04 |

Code L0650 (Lumbar-sacral orthosis):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
|---|---|---|---|
| 1,757 | 1,812 | $2,669,616.37 | $1,338,874.62 |

Code L3960 (Shoulder elbow wrist hand orthosis):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
|---|---|---|---|
| 1,481 | 1,545 | $1,340,146.11 | $738,701.26 |

Code L1971 (Ankle foot orthosis):

| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
|---|---|---|---|
| 633 | 834 | $569,942.07 | $303,147.00 |

| Code L2397 (addition to lower extremity orthosis, suspension sleeve): | | | |
|---|---|---|---|
| Beneficiaries | Claims | Amt. Submitted | Amt. Paid |
| 1,922 | 3,117 | $493,974.12 | $275,906.64 |

40.     Medicare claims data indicates that as of October 10, 2019, BERRIOS-ANTUNA has not billed Medicare Part B for covered expenses for specified telehealth services.

## B.     BERRIOS-ANTUNA

### STATEMENT

41.     On or about October 30, 2019, agents interviewed BERRIOS- ANTUNA. He admitted that he started in telemedicine by working with RediDoc in November 2018. His friend encouraged him to apply. BERRIOS-ANTUNA recalled that he called RediDoc, filled out an application, and began working with the company after they checked his medical license. BERRIOS-ANTUNA stated he also began working with another telemedicine company in December 2018, which he believed was called DMERX, and another called Quivvy Tech in January 2019.

42.     BERRIOS-ANTUNA explained the telemedicine companies sent him patients via an online portal, which included the patient information, such as their date of birth and medical conditions, on a patient "triage" form. Usually the patients had Medicare. He believed the triage form was filled out by medical assistants but acknowledged that he did not know the background of the individuals who were collecting and inputting the information and recalled an instance where a basic medication was misspelled.

43.     BERRIOS-ANTUNA stated he was paid $50 per consult or call. He believed he completed 10-40 consults a day. He estimated that he spoke to less than 10% of patients on the phone. When he did not speak to a patient he indicated that he relied solely on the patient

triage information to make his medical decision. BERRIOS-ANTUNA stated he would order

back and knee braces for patients but never ordered a lot of braces at once for a patient.

BERRIOS-ANTUNA admitted that he denied very few patients for braces. In fact, he was unsure

whether he was paid for a consult that ended in a denial because they were so infrequent. He

indicated that he did not know where the order for the DME product went after he signed it.

44.     BERRIOS-ANTUNA stated he did not have any discussions with any of the

telemedicine companies about policies for prescribing braces. Likewise, he stated he did not

really have knowledge of the Medicare rules and regulations and was not familiar with the

telemedicine requirements. If he was unsure of something, he would contact the telemedicine

company. BERRIOS-ANTUNA stated he was not aware that a face-to-face exam was required in

order to prescribe a knee brace. However, he explained that since he was only licensed in

Michigan, he made sure to only check the patient's address to ensure they were in Michigan.

45.     In general, BERRIOS-ANTUNA explained that he prescribed braces,

maintenance medications and pain creams, like lidocaine, with RediDoc. He admitted that he

never spoke with any patients from RediDoc and made his medical decision to accept or deny the

prescription solely based on the patient information that was provided in the system. He

indicated that he had not received any patient referrals from RediDoc since April 10, 2019.[1]

46.     BERRIOS-ANTUNA indicated he spoke to about 10% of the patients that were

referred to him by Quivvy.

### WRITTEN ORDERS OBTAINED FROM REDIDOC

47.     As discussed in more detail below in ¶¶ 87-113, agents obtained emails between

---

[1] On April 9, 2019, the United States Department of Justice and federal partners announced a national telemedicine and DME takedown that resulted in charges against 24 individuals responsible for over $1.2 billion in losses to the Medicare program.

RediDoc employees and BERRIOS-ANTUNA from the District of New Jersey United States Attorney's Office (NJ USAO), who are conducting an investigation into RediDoc. The NJ USAO obtained the RediDoc emails pursuant to a search warrant signed by Hon. Leda Dunn Wettre, U.S. Magistrate Judge for the District of New Jersey, on May 7, 2019. The email production from the NJ USAO included written orders for DME referrals by BERRIOS-ANTUNA for Medicare beneficiaries.

48.     The written orders include the patient's insurance information. This information is listed after a section identifying "Insurance Name And ID# and Medicare#."

49.     Every written order for DME is electronically signed by BERRIOS-ANTUNA and includes the certification that, "I, Emilio Berrios-Antuna, M.D., verify and confirm this order for the above named patient, and certify that I have personally performed the assessment of the patient for the prescribed treatment and device and verify that it is reasonably and medically necessary, according to accepted standards of medical practice within the community, for this patient's medical conditions."

50.     The written orders also contain an attached attestation where BERRIOS-ANTUNA certified that he "established a valid prescriber-patient relationship with the Patient," and that he is aware of, and his practice conforms to, applicable State laws as they relate to the requirements for telemedicine and establishing a valid prescriber-patient relationship.

51.     From in or around November 2018, through in or around May 2019, for patients from RediDoc, BERRIOS-ANTUNA submitted or caused the submission of approximately $1,248,928.53 in false and fraudulent claims to Medicare for DME that were ineligible for Medicare reimbursement because the DME was not medically necessary and not provided as represented.

## C.     STATEMENTS BY MEDICARE BENEFICIARIES AND OTHER WITNESSES

### *V.W.*

52.     On October 28, 2019, agents interviewed Medicare beneficiary V.W., who indicated he/she received a cold-call on a Saturday night in December 2018 from a man who claimed he was from Medicare. The call was approximately five to ten minutes long. The man told V.W. he/she was eligible for a free knee brace. V.W. had recently spoken to his/her primary care physician who said a knee brace would not help V.W. but instead recommended a topical cream for V.W.'s knee. V.W. told the man on the phone of this recent conversation and said he/she was only interested in topical cream instead of a knee brace. The man agreed to send him/her the cream.

53.     V.W. stated that a couple of days later, he/she received a package in the mail from a DME supplier containing two knee braces, two wrist braces, a back brace and other products. V.W. immediately returned the products to the DME supplier and contacted Medicare.

54.     V.W. indicated he/she never spoke to a physician about the braces and had never heard of BERRIOS-ANTUNA.

55.     Medicare claims data indicates BERRIOS-ANTUNA was the referring provider on claims for V.W on December 27, 2018, for a left and right knee brace (L1851), right and left knee suspension sleeves (L2397), a back brace (L0650), and a shoulder elbow wrist brace (L3960). Medicare was billed $4,728.60 for the braces and paid $0.00 in connection with claims.

### *D.B on behalf of C.B.*

56.     On January 6, 2020, agents interviewed D.B. on behalf of Medicare beneficiary C.B. D.B. is C.B's adult child. C.B. has suffered from Alzheimer's for the past five years. D.B. reported C.B. has been incoherent since the onset of Alzheimer's and has been getting

15

progressively worse. D.B. stated C.B. does not have any back or knee problems and would have

no use for knee braces, compression sleeves, or a back brace. C.B. has no physical ailments.

Neither C.B.'s primary care physician nor psychiatrist have ever recommended any type of brace

for C.B.

57.     D.B. recalled two boxes that said "medical devices" were delivered to C.B. via

the mail. D.B. knew C.B. would not order anything and they were not expecting medical devices.

D.B. stated C.B. is incapable of ordering anything for himself/herself and does not use the

telephone. D.B. did not open the boxes and just sent them back.

58.     D.B. has never heard of BERRIOS-ANTUNA and denied C.B. would have ever

spoken to a physician over the phone or have any direct interaction with a physician. C.B. does

not have the mental capacity to request braces.

59.      Medicare claims data indicates BERRIOS-ANTUNA was the referring

provider on claims for C.B. on January 22, 2019, for a left and right knee brace (L1851), left and

right knee suspension sleeves (L2397), and a back brace (L0650). Medicare was billed $3,950.73

for the braces and paid $1,159.44 in connection with claims.

60.     The written orders for the braces for C.B. are electronically signed by

BERRIOS-ANTUNA on January 16, 2019. According to the order for the back brace, "[C.B.]

has inquired about utilizing orthotic bracing for [his/her] current conditions; [his/her] chief

complaint at the time of this assessment is: Back pain." C.B. has described the pain as "aching

and sharp," and states that it was a "10 out of 10." Additionally, C.B. has had chronic pain for

over 6 years. Under the "Assessment/Plan" portion of the order, it states that "I explained the

benefits of this equipment and [he/she] is interested in the treatment."

61.     Similarly, the order for the knee braces and suspension sleeves indicates that,

"[C.B.] is currently experiencing knee pain" and "would like to discuss having a knee brace prescribed" for pain. C.B. has described the pain as "aching and sharp," and states the pain is a "constant 10" on a scale of 1-10. Under the "PLAN" portion of the order, it states that "I explained the benefits of the brace (L1851/L2397), which is an alternative, non-invasive method to potentially relieve [his/her] pain. [C.B.] has agreed to this plan. Based on our interaction, I have determined it is medically necessary and appropriate to prescribe treatment today." With respect to "FOLLOW UP", the order reads, "I provided [C.B.] with our telephone number to schedule a follow up brace evaluation or if [his/her] conditions deteriorates. I recommended [him/her] to consult with an orthopedic specialist to discuss and control [his/her] pain management regimen."

### *F.B. and K.B.*

62.     On January 16, 2020, and on February 11, 2020, agents interviewed Medicare beneficiary F.B. and his/her spouse K.B. K.B. indicated that F.B. has some memory issues. F.B. stated he/she sustained a back injury during the Vietnam War and currently receives pain shots for his/her back. F.B. has no medical issues with his/her knees, ankles, or feet. F.B. denied having surgery on his/her ankles, having arthritis in his/her knee or having chronic instability of the knee. Furthermore, F.B. stated he/she may be borderline diabetic but does not take any medication for diabetes.

63.     F.B. recalled braces just showed up one day and were delivered to their house. F.B. wasn't sure when the braces arrived but thought it was about a year ago. F.B. called Medicare after receiving the braces because he/she did not need them. The braces were kept for a while and were recently thrown away.

64.     F.B. did not remember calling a phone number about braces or speaking to a

17

doctor on the phone or to anyone about pain in his/her joints.  F.B. has never heard of BERRIOS-ANTUNA.

65.     Medicare claims data indicates BERRIOS-ANTUNA was the referring provider on claims for F.B. on February 28, 2019, for a left and right knee brace (L1851), left knee suspension sleeve (L2397), a right shoulder brace (L3960), left and right ankle foot brace (L1971) and a right foot heel stabilizer (L3170). Medicare was billed $4,519.72 for the braces and paid $2,815.89 in connection with claims.

66.     The written orders for the braces for F.B. are electronically signed by BERRIOS-ANTUNA on February 24, 2019. Collectively, according to the orders, F.B. is currently experiencing right shoulder pain, pain in both knees, and pain in both ankles. The orders indicate F.B. has surgical history on his/her ankles, currently takes diabetes medication, has had knee pain "for years" and "constant" ankle pain "for years," and describes the pain as a 10 "on a scale of 1-10." The written orders for knee braces indicates, "I explained the benefits of this equipment and [he/she] is interested in the treatment."

67.     Similarly, the written order for the right ankle brace and heel stabilizer states, "I explained the benefits of the brace(s), which is an alternative, non-invasive method to potentially relieve [his/her] pain. [F.B.] is interested in this treatment. Based on our interaction, I have determined it is medically necessary and appropriate to prescribe treatment today."  With respect to "FOLLOW UP", the order reads, "I provided [F.B.] with our telephone number to schedule a follow up brace evaluation, or if needed for questions. I recommended [F.B.] to consult with an orthopedic physician to discuss and control [his/her] pain management regimen."

### *R.K. on behalf of B.J.*

68.     On January 21, 2020, agents interviewed R.K. about Medicare beneficiary B.J.

B.J. has Down syndrome and lives at a facility that R.K. runs. The facility is staffed 24 hours a day when clients are present. B.J. has lived at the facility since October 1, 2018, and requires 24-hour supervision. R.K. explained that besides having Down syndrome, B.J. is fine physically. B.J. had knee surgery years ago before coming to the facility, but B.J. does not seem to have any problems with his/her knees. B.J. is able to walk and had job training that required him to lift fishing bait.

69.     R.K. reported B.J. tells lies quite a bit and admits to lying. B.J. has a cellular telephone and has conversations on it by himself.

70.     Someone accompanies B.J. when he/she goes to the doctor. R.K. took B.J to Dr. Karman Zakaria's office for annual physicals on November 26, 2018, and on December 9, 2019. During the December 2019 visit, B.J. told Dr. Zakaria that his/her knee hurt. Dr. Zakaria had B.J. bend his/her knee and then told B.J. that his knee was fine. Dr. Zakaria has never recommended that B.J. get braces for his/her knees, back or shoulder. B.J. does not see any other doctors or specialists. B.J. does not take any over the counter or prescription pain medication, has never been diagnosed with arthritis or have chronic knee instability.

71.     R.K. recalled two boxes of braces were delivered to the facility for B.J. around January 2019. The boxes were taken from B.J. and he/she never wore them. R.K. recalled seeing knee braces and other braces in the boxes. R.K. tried unsuccessfully to return the braces and wound up throwing the braces away. B.J. told R.K. someone called him/her about the braces. R.K. stated B.J. was not in the position to have discussions on the phone with a doctor or anyone else about his medical condition. B.J. would not be able to come up with answers to questions about his/her medical condition but could answer leading questions. R.K. stated anyone speaking to B.J. on the telephone would be aware that B.J. was cognitively impaired and know that B.J.

was a reduced capacity person. R.K. believed that it was doubtful a doctor could explain the benefits of a brace to B.J. over the phone.

72.     Medicare claims data indicates BERRIOS-ANTUNA was the referring provider on claims for B.J. on January 10, 2019, for a left and right knee brace (L1851), left and right knee suspension sleeve (L2397), a right shoulder brace (L3960) and a back brace (L0650). Medicare was billed $4,728.60 for the braces and paid $2,151.95 in connection with claims.

73.     The written orders for the braces for B.J. are electronically signed by BERRIOS-ANTUNA on January 7, 2019. According to the orders, B.J. is currently experiencing pain in both knees, back pain that is aggravated by walking and lifting things, and right shoulder pain. Collectively, the orders indicate B.J. had knee surgery 6 months ago, has had knee pain for more than 5 years due to arthritis, takes Tylenol and shots for pain, and previously took prescription and over the counter pain medication.

74.     With respect to "PLAN", the written order for knee braces indicates, "I explained the benefits of the brace (L1851/L2397), which is an alternative, non- invasive method to potentially relieve [his/her] pain. [B.J.] is agreeable to this treatment plan." The order for the back brace states something to the same effect. The order for the knee braces also states, "I recommended [B.J.] to schedule a follow up appointment if his/her condition deteriorates. [He/she] should see [his/her] orthopedic physician to discuss [his/her] pain management."

### D.H.

75.     On January 24, 2020, agents spoke to Medicare beneficiary D.H., who indicated he/she had lower back surgery about 3 years ago and received a back brace from the hospital. D.H. also had bypass surgery through his/her legs and received a leg brace through the hospital.

76.     About a year after the surgery, D.H. started having lower back pain and ordered

a "Dr. Ho" belt after seeing a television commercial and calling a phone number. The representative on the phone tried to get him to agree to receive more braces, but D.H. only wanted the "Dr. Ho" belt and refused the other braces. During the call, which was approximately 30 minutes, D.H. said that he/she spoke to a nurse and physician. D.H. received the "Dr. Ho" belt but it did not work.

77.     Shortly after making the call for the "Dr. Ho" belt, D.H. began receiving multiple calls for other braces. During the calls, D.H. confirmed having pain but denied wanting other braces. About three to four months after the calls, D.H. began receiving braces in the mail including wrist, upper back and leg braces for below the knee.

78.     D.H. has never heard of BERRIOS-ANTUNA and does not recall having a conversation with a medical professional in February 2019 about braces. Medicare claims data indicates BERRIOS-ANTUNA was the referring provider for claims for D.H. on February 12, 2019 for a left and right knee brace (L1851), left and right knee suspension sleeve (L2397), a right shoulder brace (L3960) and a back brace (L0650). Medicare was billed $4,728.60 for the braces and paid $3,118.98 in connection with claims.

79.     The written orders for the braces for D.H. are electronically signed by BERRIOS-ANTUNA on February 12, 2019. According to the orders, D.H. is currently experiencing pain in both knees, back pain, which is aggravated by walking for a long period of time and due to arthritis, and right shoulder pain, which started over 10 years ago due to arthritis and is aggravated by holding objects for a long time. Collectively, the written orders indicate D.H. takes prescription and over-the-counter pain medication, including Oxycodone.

80.     Agents reviewed the written orders for DME electronically signed by BERRIOS-ANTUNA with D.H. and D.H. indicated he/she never received two knee braces and

had approximately seven surgeries in the last five years, although the written orders indicated he/she had no surgical history. D.H. also confirmed he/she had arthritis and had a fear of falling but indicated he/she would not tell anyone that over the telephone. D.H. denied having a deformed spine or shoulder issues as indicated in the written orders. D.H. denied taking Oxycodone as reflected in the written orders.

81.     With respect to "PLAN," the written order for knee braces indicates, "I explained the benefits of the brace (L1851/L2397), which is an alternative, non- invasive method to potentially relieve [his/her] pain. [D.H.] is agreeable to this treatment plan. I have determined that it is medically necessary and appropriate to prescribe this device to help support muscles and reduce mobility and increase stabilization." The order for the back brace states something to the same effect. The order for the knee braces also states, "I recommended [D.H.] to schedule a follow up appointment if his/her condition deteriorates. [He/she] should see [his/her] orthopedic physician to discuss [his/her] pain management."

### CW-1 – Cooperating Witness

82.     CW-1 is a physician in New Jersey. On April 5, 2019, CW-1 was indicted on one count of Conspiracy to Commit Health Care Fraud in violation of Title 18, United States Code, Section 1349, and three counts of Health Care Fraud in violation of Title 18, United States Code, Section 1347 in the District of New Jersey in connection with his/her telemedicine practice at other telemedicine companies besides RediDoc and Quivvy. On September 19, 2019, CW-1 pled guilty to the count of Conspiracy to Commit Health Care Fraud.

83.     CW-1 has been interviewed multiple times by law enforcement agents in New Jersey. In substance, CW-1 indicated he/she began working as a telemedicine doctor for RediDoc in the summer of 2017 and continued with RediDoc for about 5 to 6 months. CW-1 was

paid $25 per consult at RediDoc and received payments through bill.com. On the day of payment, CW-1 would receive a notification from bill.com.

84.     CW-1 stated when he/she worked at RediDoc, patients would call him/her to complain that they received braces prescribed by him/her that they did not want. In response, CW-1 would email Stephen Luke, the owner of RediDoc, to see what was going on. CW-1 told Luke that RediDoc needed to vet the patients before they send the patient to him/her to make sure the patient actually wanted the brace. CW-1 indicated he/she quit working at RediDoc because he/she did not have a good feeling about their business. CW-1 stated RediDoc was creating fraudulent DME orders using pre-populated boxes in the order form.

### D.     FINANCIAL RECORDS

85.     Bank records were obtained from JP Morgan Chase Bank (Chase) via grand jury subpoena for BERRIOS-ANTUNA's accounts. An account ending in -5640 was opened at Chase on or about June 8, 2011. BERRIOS-ANTUNA was the only authorized signer on the account. From November 19, 2018, through April 24, 2019, twelve checks from RediDoc were deposited into the account totaling $69,110.00.

### USE OF EMAIL ACCOUNTS SUPPORTING PROBABLE CAUSE

86.     As previously articulated, during the course of the investigation, the NJ USAO provided emails from some RediDoc employees. The emails were between BERRIOS-ANTUNA and some RediDoc employees, and between some RediDoc employees about BERRIOS-ANTUNA. The NJ USAO obtained the RediDoc emails via a search warrant signed by Hon. Leda Dunn Wettre, U.S. Magistrate Judge for the District of New Jersey, on May 7, 2019. The warrant sought emails from tchavarria@redidoc.com ("Teresa Chavarria"), tzec@redidoc.com ("Trisha Zec") and vdn@redidoc.com.

87.     The emails demonstrate that BERRIOS-ANTUNA regularly used email to communicate with employees of RediDoc about many topics, including but not limited to the onboarding process, payments to BERRIOS- ANTUNA, his volume of patients from RediDoc and Quivvy, his desire to receive more patients, his concerns about committing fraud, and scheduling telephone calls with RediDoc employees.

88.     On April 19, 2018, BERRIOS-ANTUNA sent an email to Teresa Chavarria, with the subject "Permanent Telemedicine: Family Practice Job in Detroit, MI."  He wrote, in relevant part, that he would "like to apply to this position. I am bilingual [sic] English and Spanish and I live in Michigan. Attached is my resume.  Thanks."  The resume attached to the email for BERRIOS-ANTUNA lists his email address as emilouws@gmail.com and his phone number as (917) 450-1958 (BERRIOS-ANTUNA cellular phone number). The resume indicated that BERRIOS-ANTUNA has "profound knowledge of family medical practice," and "outstanding knowledge of pharmaceutical drugs and medical principles."

89.     On April 20, 2018, BERRIOS-ANTUNA received an email from Teresa Chavarria with the subject "RediDoc Virtual Doctor Network." In the email, Chavarria wrote, in relevant part, that "RediDoc is excited about your interest in joining our Virtual Doctor Network." She also wrote that "some of the benefits include….up to $30 Per [sic] visit." The signature block on the email indicates that the email was sent by Teresa Chavarria, Account Representative, RediDoc.

90.     On October 26, 2018, BERRIOS-ANTUNA  received an email from physicianonboarding@redidoc.com ("Physician Onboarding") with the subject "RediDoc Physician Agreement." Teresa Chavarria was copied on the email. The email states, in relevant part, that "RediDoc is very pleased to announce that you have been approved to join our Virtual

Doctor Network. Please Click Here to Sign [sic] our Physician Services Agreement." The end of the email states, "If you have any questions, please contact physicianonboarding@redidoc.com and a RediDoc representative will contact you back as soon as possible." The signature block on the email indicates the email was sent by Physician Onboarding and lists the phone number for Physician Onboarding as (602) 980-6753 (Physician Support phone number).

91.     A Short Form Physician Application (Application) that was electronically signed by BERRIOS-ANTUNA on October 26, 2018, was included in the production of BERRIOS-ANTUNA emails from the NJ USAO. The application includes a section titled "Fraud Warning" that indicates in a number of states, including Michigan, "any person who knowingly, and with intent to defraud any insurance company or other person, files an application for insurance or statement of claim containing any materially false information, or, for the purpose of misleading, conceals information concerning any fact material thereto, may commit a fraudulent insurance act which is a crime in many states." The Application included a "Physician Non-Disclosure Agreement" (Agreement) which indicates that "the Parties are contemplating into agreement for mutually beneficial business relationships connected with Physician's participation as an independent contractor in RediDoc's proprietary physician network, through which Physician will gain access to patients who are steered to participating network physicians, so they may be provided telehealth and/or telemedicine services." The agreement was electronically signed by BERRIOS-ANTUNA on October 26, 2018 and lists his email address and  cellular phone number. The Agreement was countered- signed on behalf of RediDoc by Stephen Luke, CEO.

92.     On October 26, 2018, BERRIOS-ANTUNA received an email from Physician Onboarding with the subject "RediDoc Payment Information." Teresa Chavarria was copied on

25

the email. The email indicates, in relevant part, that "you will receive an invite from Bill.com in the near future requesting you to create an account to set up your direct deposit information in order to receive payment from RediDoc. Payments will be on the 5th and 20th day of each month."

93.     On October 26, 2018, BERRIOS-ANTUNA received an email from Physician Onboarding with subject "Re: RediDoc Test Patient" with records for a test patient for BERRIOS-ANTUNA to review through the "web portal." On that same day BERRIOS-ANTUNA sent an email response to Physician Onboarding indicating that "I have followed your easy steps on your portal till the end. I am so glad how intuitive is your portal [sic]. Thank you for the prompt responses and looking forward to start with real patients!"

94.     On November 5, 2018, BERRIOS-ANTUNA sent an email to Physician Onboarding with the subject "Re: Payment Information." Teresa Chavarria was copied on the email. BERRIOS-ANTUNA wrote, "Hello, What State [sic] has the highest volume in call? I am planning on getting a second state license. Your answer will help me decide which state I should choose." On November 6, 2018, Physician Onboarding responded via email stating, "Hello Dr. Berrios, You have been set up in Bill.com in the third party site we use for compensation. Some of our high volume states are VA, DC or NC. Thank you!"

95.     On November 9, 2018, BERRIOS-ANTUNA sent an email to Physician Onboarding indicating that, "I have noticed that the number of patients assigned to me is very low. What are the factors to increase the volume of patients assigned to me?" That same day, Physician Onboarding responded to BERRIOS-ANTUNA's email and stated, in relevant part, that "volume varies month to month and state to state therefore the recommendation we provide to attain more volume would be acquiring multiple licenses."

96.     On November 16, 2018, BERRIOS-ANTUNA sent an email to Physician Onboarding asking, "Is it normal to not have received any patient [sic] in the last 2 weeks? I am working with Quivvy as well and they send me patients on a daily basis. I am just wondering if this how it works depending on the volume of calls."

97.     On December 17, 2018, BERRIOS-ANTUNA received an email from nmandic@redidoc.com (Nada Mandic) stating, in relevant part, "Please note that Patient 1311859 would like to speak to you with regards to the products that you have prescribed. The consult has been approved and signed by you on 11/30/2018 and you may access the records through your Dashboard. The contact number is 231-425-6457."     The signature block on the email indicates that Nada Mandic is a "Medical Admin Assistant, Physician Support."

98.     On December 18, 2018 at 3:51 am, BERRIOIS-ANTUNA sent an email to Nada Mandic stating, "I came late and I was not sure if I could call the patient. I looked at her record and they were Braces [sic] products. Is it possible to find out why she wants to speak to me? My schedule is hectic this week and I do come late each night. I will try to reach her when I can. Please call her back and find out what she is asking about."

99.     On December 18, 2018 at 8:11 am, BERRIOS-ANTUNA received an email from Nada Mandic with the Subject "Re: Patient ID 1311859." Trisha Zec was copied on the email. In the email, Mandic wrote that the "the patient has additional questions with regards to prescribed braces, and she would like to speak to the prescribing Physician. Please note that we do understand you have a tight schedule that you have to follow, however, please reach out to the patient when you get the chance."

100.     On December 18, 2018, at 3:41 pm, BERRIOS-ANTUNA sent an email to Nada Mandic with the subject "Re: Patient ID 1311859." He stated that, "I called the patient and

she is wondering how she got approved for the braces since she never called. Can you confirm

what is going on? Please call the patient and assure to her that she made the call and that's why

she was routed to me. She said she had no idea and might think it is fraud against Medicare. Can

you please update me on the case?"

101.     On December 18, 2018, at 10:49 pm, Nada Mandic sent an email to Trisha Zec

and Physician Support stating, in relevant part, that "Dr. Antuna called us after sending this

email, he advised that the patient would like to return the products and he said that he would like

to be updated on this."

102.     On December 21, 2018, BERRIOS-ANTUNA received an email from

Physician Support stating in relevant part that, "please note that you have consults assigned to

you, kindly check your email to review." The phone number for Physician Support was listed as

(805) 613-7159 (Physician Support phone number). On that same day, BERRIOS-ANTUNA

sent an email in reply and stated, in relevant part, that "I am doing my best to go over it all! I

have been going through the audio recording of each patient to make sure they need what is

displayed! Am I the only dr [sic] assigned in Michigan?" That same day, BERRIOS-ANTUNA

received an email from Physician Support and Trisha Zec was copied on the email. The email

stated, in relevant part, "Please note that this email has been sent as a notification that you have

consults assigned to you and we definitely understand that the process can take longer."

103.     On December 19, 2018, BERRIOS-ANTUNA received an email from

Physician Support stating, in relevant part, that RediDoc was "about to open the platform to start

facilitating laboratory requests from consumers. It will initially be Cancer Screening Tests and

we would like to check in with you if you would be interested in participating in the laboratory

reqs program. The process will be the same for you to approve or decline and compensation is

also $20/consult. Please advise."

104.    On December 19, 2018, BERRIOS-ANTUNA sent an email from the Target

Account to Physician Support in response stating, in relevant part that "I wish not to participate

in this one." However, on April 5, 2019, BERRIOS- ANTUNA sent an email to Physician

Support stating, in relevant part, "Can I try to be a part of the Cancer screening to get an idea

what would I be doing?  If I like it I'd keep it. Would that be ok?" In another email dated April 5,

2019 from BERRIOS-ANTUNA to Physician Support, BERRIOS- ANTUNA asked "what

would be the consult rate for Cancer screening?" Physician Support responded and sent an email

to the Target Account on April 5, 2019, stating, in relevant part that, "the compensation is $30

per connection."

105.    On April 10, 2019, BERRIOS-ANTUNA sent an email to Physician Support

with the Subject "DME fraudulent news stating, in relevant part, "Yesterday I saw on NBC a

report about possible fraudulent practice of Telemedicine with durable medical equipment.

Although I believe that RediDoc is far from that having all the regulations and monitoring I am

noticing, how would you assure that RediDoc is conducting a professional and compliant

operation? I am only looking for some piece of mind."

106.    On April 10, 2019, BERRIOS-ANTUNA received an email from Physician

Support and Trisha Zec was copied. The email stated, in relevant part, "I have tried calling you,

however was transferred to voicemail. Please advise when would be the best time for us to give

you a call."

107.    Phone records relating to the BERRIOS-ANTUNA cellular phone number were

obtained from Verizon Wireless (Verizon) via grand jury subpoena. The records date back to

December 28, 2018. The phone records document an incoming call to the BERRIOS-ANTUNA

cellular phone number from the Physician Support phone number on April 10, 2019, lasting approximately 39 seconds.

108.     On April 15, 2019, at 9:30 am, BERRIOS-ANTUNA sent an email to Trisha Zec stating, in relevant part, "I am noticing that I am not having patients since last Thursday while the norm would be around 20 patients a day for the past 3-4 months. I am surprised for this drop in volume. Can you please let me know what is the issue here?"

109.     On April 15, 2019 at 11:53 am, Verizon phone records document an outgoing call from the BERRIOS-ANTUNA cellular phone number to Physician Support phone number lasting approximately 44 seconds.

110.     On April 15, 2019 at 12:03 pm, BERRIOS-ANTUNA sent an email to Trisha Zec stating, in relevant part, "I would like to talk to you as [sic] your convenience. Please give me a call at (917) 450 1958."

111.     Later that evening, on April 15, 2019, BERRIOS-ANTUNA received an email from Trisha Zec stating, in relevant part, that "we are currently updating our systems and processes. We will notify you when these modifications are complete, which we anticipate being within the next 10 days."

112.     On April 29, 2019, BERRIOS-ANTUNA sent an email to Trisha Zec asking, "Any updates on the date for RediDoc to be up again?"

113.     Verizon phone records document approximately 15 telephone calls between the BERRIOS-ANTUNA cellular phone number and the Physician Support phone number occurring between May 5, 2019 and July 25, 2019.

## PROBABLE CAUSE FOR SEIZURE OF FUNDS FROM TARGET ACCOUNT

114.     As part of this investigation, records were obtained and reviewed for financial

involvement relative to allegations of violations of federal law by Emilio Berrios-Antuna and others known and unknown. Having reviewed several accounts, it was determined that the account listed below contained proceeds of illegal activity and/or were involved in, or traceable to Berrios-Antuna's participation in a scheme to defraud the Medicare System.

115. Financial records obtained by subpoena from JP Morgan Chase Bank, show that Account No. 3026585640 is a savings account held in the name of Emilio Berrios-Antuna. Emilio Berrios-Antuna is the only signatory listed on the account.

116. As previously reported within this affidavit, review of financial records from JP Morgan Chase Bank confirmed that between November 19, 2018, and April 24, 2019, Account No. 3026585640 owned and controlled by Berrios-Antuna, received twelve check deposits totaling $69,110.00, listing Dr. Emilio Berrios-Antuna, as payee and drawn against an account owned by RediDoc, located in Scottsdale Arizona, representing payment for Berrios-Antuna's services that were medically unnecessary, and/or not eligible for Medicare reimbursement.

## CONCLUSION

117. I am aware that Title 18, United States Code, Section 981(b)(3) authorizes the issuance of a seizure warrant in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b), and may be executed in any district in which the property is found.

118. I am aware that Title 28, United States Code, Section 1355(b) authorizes the filing of a forfeiture action in the District Court for the district in which any of the action or omission giving rise to the forfeiture occurred.

119. Given the facts obtained during the investigation of this matter, and set forth herein, there is probable cause to believe that at least $69,110.00 deposited into this

account constitute proceeds of Health Care Fraud, in violation of Title 18, United States Code, Section 1347, and therefore subject to seizure and criminal and/or civil forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7).

120.    Your affiant requests that for the following account, a warrant be issued to seize, for purpose of civil and/or criminal forfeiture, all funds on deposit up to $69,110.00 in the following account: **JP Morgan Case Bank Account No. 3026585640**.

121.    Affiant further requests that the financial institution where the account is established be instructed to provide federal agents with the current account balance upon seizure, as follows:

**The financial institution upon which this seizure warrant has been served is instructed to provide federal agents authorized to seize the funds with the current balance in each account upon service of the seizure warrant and at the request of the FBI agents authorized to seize the funds.**

## REQUEST FOR SEALING

122.    It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Special Agent Collin Ward
Federal Bureau of Investigation

Sworn to before me and signed in my presence
And/or by reliable electronic means.

The Honorable Elizabeth A. Stafford
United States Magistrate Judge

Dated: _____ September 25, 2020 _____

33

## ATTACHMENT A

All Funds on Deposit in JP Morgan Chase Bank Account Number 3026585640 up to and including $69,110.00 with permission to serve the warrant electronically followed by original service.

**The financial institution upon which this seizure warrant has been served is instructed to provide federal agents authorized to seize the funds with the current balance in each account upon service of the seizure warrant and at the request of the FBI agents authorized to seize the funds.**

AUSA: Michael El-Zein     Telephone: (313) 550-2922

AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture   Special Agent:    Collin Ward     Telephone: (314) 574-8928

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

| In the Matter of the Seizure of | ) | Case: 2:20-mc-51137 |
|---|---|---|
| *(Briefly describe the property to be seized)* | ) | Assigned To : Parker, Linda V. |
| All Funds on Deposit in JP Morgan Chase Bank Account | ) | Assign. Date : 9/25/2020 |
| Number 3026585640 as further described on Attachment A | ) | In Re: SEALED MATTER (MAW) |
| | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the       Eastern       District of       Michigan       be seized as being subject to forfeiture to the United States of America. The property is described as follows:

All Funds on Deposit in JP Morgan Chase Bank Account Number 3026585640 as further described on Attachment A

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before   October 9, 2020  

                                                        *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to the presiding United States Magistrate Judge on duty       .

            *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for     days (not to exceed 30)     ☐ until, the facts justifying, the later specific date of       .

Date and time issued:     September 25, 2020   12:05 pm      *Elizabeth A. Stafford*

                                                           *Judge's signature*

City and state:     Detroit, MI                 Elizabeth A. Stafford       U. S. Magistrate Judge

                                                             *Printed name and title*

AO 109 (Rev. 11/13)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of: | | |
| Inventory of the property taken: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*